IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| SARAH HOUSE, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL ACTION NUMBER |
| | ) 00-C-2016-W |
| METROPOLITAN LIFE INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

Plaintiff Sarah House filed this action after benefits she received under a long term disability ("LTD") policy were terminated. Metropolitan Life ("MetLife") issued the policy to DCH Regional Medical Center ("DCH"), where Plaintiff was an employee. She filed this suit pursuant to ERISA alleging that Defendant acted in bad faith in terminating her benefits on June 22, 2000. The case was then removed to this Court on July 20, 2000.

Plaintiff was involved in an automobile accident on September 13, 1997, in which she fractured her left femur, right patella, nose, and cheekbone. She also collapsed her lungs and cracked her ribs. Prior to the accident, Plaintiff had worked as a licensed practical nurse ("LPN") at DCH for approximately ten years. She filed for LTD benefits on September 25, 1997. MetLife's Plan states:

> **Disability** or **Disabled** means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:
>
> > a.  you are unable to perform each of the material duties of your regular job; and

1



    b. after the first 24 months of benefits payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking in consideration your training, education, experience and past earnings.

Exhibit #2, p. 5. MetLife granted Plaintiff's disability application effective December 12, 1997, acknowledging that Plaintiff could not perform the material duties of a LPN. These benefits continued to be effective until December 12, 1999, at which time, Plaintiff had to be unable to perform any occupation for which she was reasonably qualified.

  In August 1998, Plaintiff underwent a Functional Capacity Evaluation which revealed that she was restricted in the range of motion of her right knee and had a reduced tolerance to static sitting. She could not crawl, kneel, or crouch. The evaluation also revealed that Plaintiff "demonstrates basic abilities in the Light Work category." Exhibit #1 to Sullivan Affidavit, Bates #225-227. Plaintiff underwent a Transferrable Skills and Labor Market Analysis in September and October 1998 where several jobs in the light category were identified consistent with these restrictions.

  In December 1998, video surveillance was conducted where Plaintiff was observed operating a vehicle, running errands, and carrying a small child. *Id.*, Bates #184; 199-200. Plaintiff sent MetLife her daily living form indicating that she could not return to work because of rheumatoid arthritis, osteoarthritis, hypothyroid, depression, and sinusitis in April 1999. *Id.*, Bates # 162-166. MetLife also received a statement by Dr. Mark Ricketts, Plaintiff's internal medicine physician. *Id.*, Bates # 163. Dr. Ricketts stated that Plaintiff was ambulatory and her condition had improved, but that she was currently totally disabled. However, he expected her to be able to perform work in 3-6 months.

  Another video surveillance in May 1999 showed Plaintiff driving with her son to a

foodmart, where she entered the store, fueled her vehicle and then drove to a business.

The Social Security Administration denied her disability benefits claim in June 1999. *Id.*, Bates # 120. However, that case is currently on appeal.

In July 1999, MetLife received an update from Dr. Ricketts. *Id.*, Bates # 166-78. Although Dr. Ricketts had indicated that Plaintiff could begin restricted work in April 1998, he now noted that she was disabled by rheumatoid arthritis and incapable of working. *Id.*, Bates # 163. However, Plaintiff's orthopedic physician, Dr. David Burandt, who last treated Plaintiff on December 11, 1998, released Plaintiff to return to full time work and stated that Plaintiff was capable of performing work outside her own occupation with no restrictions. *Id.*, Bates # 103. MetLife conducted another Transferrable Skills analysis in December 1999 and still found a number of jobs in the light category that Plaintiff was capable of doing. *Id.*, Bates # 101-102.

Using all this information, MetLife found that although she could not return to her previous work, she was able to perform other light jobs in the economy. Because only participants who are unable to perform any gainful work can continue to receive LTD benefits, MetLife terminated Plaintiff's benefits.

## II.

The United States Supreme Court has held that actions for termination of ERISA plan benefits should be judicially reviewed under the *de novo* standard unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114 (1989). The undisputed facts show that under the plan MetLife has the discretionary authority to determine eligibility for benefits and interpret the terms of the Plan. Using the arbitrary and

capricious standard, the court must determine whether MetLife had a reasonable basis for its decision to terminate Plaintiff's benefits based upon the facts known to MetLife at the time the decision was made. *See Jett v. Blue Cross and Blue Shield of Alabama*, 890 F.2d 1137, 1139 (11th Cir. 1989).

However, MetLife insures the plan and acts as Claims Administrator for the Plan. This dual role creates a conflict of interest requiring the Court to evaluate MetLife's decision under a modified arbitrary and capricious standard. *Brown v. Blue Cross & Blue Shield*, 898 F.2d 1556, 1566-67 (11th Cir. 1990). In *Brown*, the Eleventh Circuit held that when a substantial conflict of interest is demonstrated on the part of the fiduciary responsible for benefits, the fiduciary must show that its interpretation of the Plan provision was "not tainted by self-interest." *Id.* at 1566. Where a conflict of interest exits, the Court must first determine whether the fiduciary's interpretation is wrong. *Id.* at 1566-67, fn. 12. If the Court determines that the fiduciary interpretation is correct, then no further consideration of a possible conflict of interest is required. *HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 992 (11th Cir. 2001).

### III.

The Court has carefully reviewed all the evidence and it concludes that the decision of MetLife is not plainly wrong. There was evidence – the opinion of Dr. Burandt, the Functional Capacity Evaluations of Plaintiff and the video surveillances – sufficient to support a reasonable conclusion that Plaintiff is able to perform jobs in the national economy.

By separate order Defendant's motion for summary judgment will be granted.

Done this 31st day of May 2001.

                                                             _____
                                                             Chief United States District Judge
                                                             U. W. Clemon